IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No. 10-cv-00080-WYD

FRANCOIS DOMINIQUE MICHEL SALINIER,

      Petitioner,

v.

AMANDA JOY MOORE, a/k/a AMANDA JOY MINARIK, a/k/a AMANDA JOY
SALINIER,

      Respondent.

And Concerning the Minor Child, S.G.S.

---

**ORDER**

---

I.   <u>INTRODUCTION</u>

      THIS MATTER is before the Court on the Petition for Return of Child (docket #1),

filed January 14, 2010. The Petition was filed pursuant to the Convention on the Civil

Aspects of International Child Abduction ("Convention"), done at The Hague,

Netherlands on October 25, 1980, 51 Fed. Reg. 10493, March 26, 1986, and federal

legislation facilitating and implementing the Convention in the United States, the

International Child Abduction Remedies Act ("ICARA"), Public Law 100-300 at 42 U.S.C.

11601, *et seq.*

      Petitioner, Francois Dominique Michel Salinier, alleges that the minor child

(hereinafter referred to as "minor child" or "S.G.S.") was wrongfully removed from his

habitual residence of France by his mother, Respondent Amanda Minarik, in violation of

her custody and or access rights.  The Petitioner seeks the return of the minor child to France.  A hearing was held on the Petition over several days including February 23, 2010, February 24, 2010, and February 25, 2010.  Both Petitioner and Respondent testified at the hearing.  In addition, Petitioner called both his uncle, attorney Dominique Ceccaldi, and his aunt, Magistrate Sylvie Guebel, to testify as to the interpretation of the French Divorce Agreement as well as his current wife, the minor child's stepmother.  Respondent called her mother and her 11 year old daughter, the minor child's half-sister.

Additionally, prior to the February 23, 2010 hearing, at the Respondent's request[1], I appointed Dominique Tavernier, L.M.F.T., a licensed marriage and family therapist, to evaluate the minor child particularly because of a language barrier.  The minor child only speaks French, and while she resides in Colorado, Ms. Tavernier was born in France and is fluent in French.  Ms. Tavernier testified as an expert witness at the February 23, 2010 hearing as to the issues of whether a grave risk exists to the minor child if he were to be returned to France to live with his father along with the minor child's maturity and assessment of appropriate decision-making skills.  Finally, on February 24, 2010, the minor child testified on the record outside the presence of the parties with the assistance of a French interpreter.

II.    BACKGROUND

Petitioner and Respondent were married in Las Vegas, Nevada on June 14,

---

[1] After an initial objection, Petitioner ultimately agreed to the appointment of the expert witness, Ms. Tavernier.  I note that the minor child speaks French and only limited English.  Ms. Tavernier is fluent in French.

2002.  Respondent has a daughter from a previous relationship who is currently 11 years old and is not the subject of this petition.  The parties' minor child, S.G.S., was born on August 16, 2002 in Colorado and is currently 7 years old.  The parties subsequently resided in Colorado until the entire family (including the minor child and the Respondent's daughter) moved to Paris, France in May or June of 2004.  While living in Paris, the parties decided to commence divorce proceedings to dissolve the marriage.  A divorce agreement was drafted and signed by both parties in early 2006.[2]  I note that both parties were independently represented by legal counsel during the divorce proceedings.  After signing the divorce agreement, Respondent and her daughter moved back to the United States in early 2006.  The minor child stayed with Petitioner in France.  The divorce became final on December 12, 2006.

Pursuant to the divorce agreement submitted to the Court, both parties have parental authority of the minor child, S.G.S.  The divorce agreement states that the "child's habitual residence shall be with his father in Paris 15th, 33 Bis rue Mademoiselle."  *See* Divorce Agreement at III.  Further "the child shall pertain to the tax home of his father, with whom he shall have his habitual residence."  *Id.* at IV.  Additionally Respondent "shall not pay any contribution toward the support and education of [the child], for which her husband [Petitioner] shall be fully responsible."  *Id.* at V.  Under the divorce agreement, Respondent's "right of visitation and

---

[2] There was some dispute as to the date the divorce agreement was executed by the parties.  Petitioner testified that the date on the document, February 23, 2006, was the date on which the documents were filed with the French court.  While it is unclear as to which date the parties actually executed the agreement, it appears to have been in late January of 2006.

accommodation shall be exercised as follows . . . the Christmas holidays and the other school holidays, provided that Mr. Salinier [Petitioner] shall be able to enjoy four weeks vacation with his son [S.G.S.], divided into two weeks during the summer and two weeks during the All Saints' Day and/or February holidays." *Id.* at III.

From December 2006 to January 2010, the parties operated under the custody provisions set forth in the divorce agreement. Respondent visited the minor child in France in December of 2006 when the divorce was finalized, and Petitioner brought the minor child to the United States for a visit in December of 2008. In the summer of 2009, the minor child traveled to the United States to visit the Respondent for a period of three weeks. On December 22, 2009, the minor child again traveled to the United States to visit Respondent for the Christmas holidays. The minor child was scheduled to return to France on January 3, 2010. On January 3, 2010, Respondent notified Petitioner via e-mail that she would not be returning the minor child to France. The minor child was not returned to France and remained in Colorado with the Respondent. On January 14, 2010, Petitioner filed the instant petition, which is pending before me.

I note that the parties paint a starkly different picture of what family life was like in both Colorado and France. Petitioner describes his marriage with Respondent as "difficult," but he denied any instances of violence. Petitioner characterized the marital problems as "normal" arguments and "fighting." Petitioner's current wife, the minor child's stepmother, testified that she has never witnessed any violent behavior by the Petitioner either directed toward her or the minor child. I note that the minor child's stepmother is a social worker in France and works with at-risk adults and children. The

stepmother further opined that the minor child is not subject to a grave risk of physical or psychological harm living in France with the Petitioner.

Respondent, on the other hand, claims that her life was filled with fear and distress from living with a controlling and abusive husband. While Respondent alleges that Petitioner was physically violent to her and her daughter, Respondent testified that no abuse was ever inflicted upon the minor child at issue. Respondent's 11 year old daughter, the minor child's half-sister, testified that she recalled several incidents of violence between the Petitioner and the Respondent. She recalled an incident where she witnessed and "heard" Petitioner "push" and "punch" Respondent. Respondent's 11 year old daughter also recounted one incident where Petitioner "slapped" her own face. Respondent further presented evidence from her mother who stated that she observed several instances of domestic violence and believed Petitioner was an "arrogant" and abusive man.

On February 24, 2010, S.G.S. testified on the record without the parties present with the assistance of a French interpreter. S.G.S. testified that he remembered his parents "screaming" at each other "a long time ago", but he had no memory of any violence between his parents. S.G.S. further testified that his father occasionally "screams" at him when he is not performing satisfactorily at his school work. S.G.S. also indicated that he misses his half-sister and wishes to live with her. S.G.S. stated that his first preference would be to live in France with his half-sister.

The conflicting evidence and the emotion by which it was presented placed me in a difficult dilemma of deciding which party to believe. The parties recounted completely

different versions of the relevant events.  Respondent did not offer any police reports or medical evidence supporting her claims of abuse.  When the expert witness, Ms. Tavernier, testified at the February 23, 2010 hearing, I questioned her as to her determination of the credibility of the parties.  Ms. Tavernier met with both parties, S.G.S.'s stepmother, the Respondent's daughter, along with S.G.S. and issued her opinions and recommendations based on those sessions.  Ms. Tavernier testified that she believed both parties' diametrically opposing accounts of their family life and found both parties to be credible.  Ms. Tavernier further testified and stated in her report that the minor child did not recall witnessing any instances of domestic violence nor did he exhibit any signs of trauma related to domestic violence.  Ms. Tavernier also reported that after her observations of the minor child, he "appears to be a bright, well adjusted child.  He seemed happy in the presence of his mother, his sister, his father, and Mrs. Salinier, his stepmother.  He talked easily about his life at his mother's house and his life at his father's house."  Expert Report at 2.  Ms. Tavernier also opined that the minor child "did not recall incidences of domestic violence between his father and mother."  *Id.* Ms. Tavernier further stated that while the minor child does not object to living with his father, he wishes to stay in the United States with his mother primarily "to help his mother who has four children including him."  *Id.* at 5.  My personal observations of S.G.S.'s demeanor, during his testimony, support Ms. Tavernier's observations.

III.   ANALYSIS

In the petition now before the Court, Petitioner alleges that S.G.S. is under 16 years of age, and has been wrongfully removed from his habitual residence (France) in

breach of the custody rights of Petitioner.  In response, Respondent contends that she

was coerced both into moving to France and into signing the divorce agreement.  Thus,

Respondent argues that the divorce agreement is invalid to the extent that it states that

S.G.S.'s habitual residence is France.  Respondent further contends that returning

S.G.S. to France would expose him to grave physical and psychological harm due to

the alleged acts of domestic violence.  Finally, Respondent requests that I determine

that the minor child is mature enough for the Court appropriately to consider his views

under the Convention.

"The Convention and ICARA serve, in part, to prevent parents from abducting

children in order to avoid the jurisdiction of courts with rulings they do not (or believe

they will not) agree." *Shealy v. Shealy*, 295 F.3d 1117, 1121 (10th Cir. 2002).  "The

treaty and legislation seek 'to preserve the status quo and to deter parents from

crossing international boundaries in search of a more sympathetic court.'" *Id.* (quotation

omitted).  However, the scope of inquiry under the Hague Convention "is limited to the

merits of the abduction claim", not any underlying custody disputes.  *Id.* (quotation

omitted).  "In a case arising under ICARA and the Hague Convention, the district court

must determine whether the removal of a child was 'wrongful' under the definition as set

forth in the Convention."  *Id.* at 1121-22.  "The petitioner bears the burden of showing by

a preponderance of the evidence that the removal . . . was wrongful."  *Id.*

Article 3 of the Hague Convention outlines when the removal or retention of a

child is wrongful for the purposes of Article 12.   Pursuant to Article 3:

The removal or the retention of a child is wrongful if:

a) it is in breach of rights of custody attributed to a person, an institution of any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of the removal or retention those rights were actually exercised, either jointly or alone, or would have been exercised but for the removal or retention.

*Whallon v. Lynn*, 230 F.3d 450, 454 (1st Cir. 2000). No wrongful removal exists without the possession of custodial rights by the parent seeking the child's return. *Gonzales v. Guiterrez*, 311 F.3d 942, 948 (9th Cir. 2002).

If the petitioner establishes these elements "the authority concerned [the court] shall order the return of the child forthwith" unless certain exceptions under Art. 13 and 20 can be established by the Respondent. 42 U.S.C. § 11603(e)(2). These exceptions include that: "1) the person requesting return was not at the time of the retention or removal, actually exercising custody rights or had consented to or subsequently acquiesced in the removal or retention . . . [which must be proved by a preponderance of the evidence]; [and] 2) the return of the child would result in grave risk of physical or psychological harm to the child . . . [which must be proved by clear and convincing evidence] . . .." *Ohlander v. Larson*, 114 F.3d 1531, 1534 (10th Cir. 1997); 42 U.S.C. § 11603(e)(2).

A.      Habitual Residence of S.G.S.

I first address S.G.S.'s habitual residence prior to the alleged wrongful removal. Petitioner asserts that S.G.S. was a habitual resident of France prior to the alleged

wrongful removal while Respondent contends that S.G.S. was a habitual resident of the United States prior to the alleged wrongful removal. Respondent's argument is premised on her assertion that she was coerced into moving to France in 2004 and again coerced into signing the divorce agreement, which states that S.G.S.'s habitual residence is in France with his father.

The term "habitual resident" is not defined in the Hague Convention or the International Child Abduction Remedies Act. As a consequence, courts have held that the facts and circumstances of each case must be assessed. *See Prevot v. Prevot*, 59 F.3d 556, 560 (6th Cir. 1995). "'The intent is for the concept . . . to remain fluid and fact based, without becoming rigid.'" *Prevot*, 59 F.3d at 560 (quoting *Levesque v. Levesque*, 816 F. Supp. 662, 666 (D. Kan. 1993)). The Third Circuit in *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3rd Cir.1995) defined habitual resident as "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." The Third Circuit went on to hold, "We further believe that a determination of whether any particular place satisfies this standard must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there." *Id.* The Fourth Circuit in *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001) stated that it was guided by its sister circuits in concluding that "'there is no real distinction between ordinary residence and habitual residence" (quoting *Friedrich v. Friedrich*, 938 F.2d 1396, 1401 (6th Cir. 1993) ("*Friedrich I*") and *Ryder v. Ryder*, 49 F.3d 369, 373 (8th Cir. 1973)). The Sixth Circuit in *Friedrich I* held that "habitual

residence must not be confused with domicile" and that "[o]n its face, habitual residence pertains to customary residence prior to the removal." *Friedrich*, 938 F.2d at 1401. It further held that "[t]o determine the habitual residence, the court must focus on the child, not the parents, and examine past intentions, not future intentions." *Id.*

Here, the divorce agreement, executed by both parties, states that the minor child's habitual residence is France. Immediately prior to signing the divorce agreement, it is undisputed that the Respondent was hospitalized in Paris in a "mental institution" for suicidal statements and actions. Respondent was in the mental hospital for several days until Petitioner signed her release papers. Respondent argues that her "suicidal" mental state calls into question her consent to the divorce agreement.

After considering the totality of the evidence, I reject this argument. First, Respondent obtained funds from her family and hired her own independent legal counsel to represent her during the divorce proceedings. The funds were sufficient to secure counsel for a uncontested divorce agreement. Second, Respondent signed the provisional divorce agreement with input from counsel in late January of 2006. Third, after signing the provisional document, the Respondent left France without the minor child and did not return for 11 months. In that period of 11 months, Respondent testified that she made no efforts to file objections or to seek any modification regarding the terms and conditions of the divorce agreement. Fourth, Respondent returned to France in December 2006 to finalize the divorce. The parties together and individually met with a French magistrate judge at which time the Respondent affirmed the contents of the document and expressed no objection. Fifth, Respondent testified that she understood

the terms set forth in the divorce agreement and never raised an objection.  Moreover, there is no evidence to support Respondent's claim that she was coerced into moving to France.  The testimony shows that the family decided to move to France for an indefinite period of time in order for the Petitioner to pursue an employment opportunity.

Additionally, there is no dispute that S.G.S. has lived in France since at least June of 2004 when he was almost two years of age.  While S.G.S. has made visits to the United States since that time, he has always returned to France.  S.G.S. speaks French, attends school in France, participates in activities in France, and has formed friendships in France.  S.G.S. also spends considerable time with his paternal grandparents in France.  Moreover, S.G.S. speaks limited English that he learned from his brief time in the United States.  Therefore, I find that the credible evidence compels the conclusion that S.G.S. was habitually resident in France immediately prior to his retention in the United States.  France is the place where S.G.S. "has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective."  *Feder*, 63 F.3d at 224.

B.    Whether the Petitioner Has Exercised Rights of Custody

Next, I must determine whether Petitioner has established by a preponderance of the evidence that he was exercising custody rights under the laws of France immediately prior to the wrongful removal or retention.  As an initial matter, I shall consider whether the parties' custody agreement provides the Petitioner with a right of custody.  Pursuant to Article 3, custody rights may arise (a) by operation of law, or (b) by reason of a judicial or administrative decision or an agreement having legal effect

under the law of the country of habitual residence.  In addition, Article 5 of the Hague

Convention distinguishes between "rights of access" and " rights of custody" for the

purposes of the Hague Convention as follows:

> a) "rights of custody" shall include *rights relating to the care of the person of the child* and, in particular, the *right to determine the child's place of residence;*
>
> b) "rights of access" shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

Hague Convention, art. 5.  Case law makes it clear that the remedy of return is solely

for violations of rights of custody.  *Whallon,* 230 F.3d at 455.

Here, the parties entered into a divorce agreement, which outlined custody

provisions concerning S.G.S.  The divorce agreement eventually became final in

December of 2006.  At the time the divorce agreement was finalized, S.G.S. was

residing in France with Petitioner while the Respondent returned to live in Colorado.

The parties' divorce agreement pertaining to the custody of S.G.S. provides that  "the

child shall pertain to the tax home of his father, with whom he shall have his habitual

residence."  Divorce Agreement at IV.  The agreement went on to state that

> [i]t is agreed between the parties that Ms. Moore Salinier [Respondent] shall not pay any contribution toward the support and education of . . . [S.G.S.], for which her husband shall be fully responsible, with the exception of the periods during which Ms. Moore Salinier shall exercise her rights of visitation and accommodation, which shall be for her expense.

Divorce Agreement at IV-V.

Based on the relevant provisions outlined in the divorce agreement and the

evidence presented on the record, I find the Petitioner has formal custody of S.G.S., with only visitation or access rights for Respondent. Petitioner has established by a preponderance of the evidence that he was exercising custody rights over the minor child but for the Respondent's retention. I find Respondent's retention of S.G.S. since January 3, 2010 is in violation of Petitioner's custody rights under French law. *See* Hague Convention, art. 3(b); *Furnes v. Reeves*, 362 F.3d 702, 715 (11th Cir. 2004) (noting that "custody of a child entails the primary duty and ability to choose and give sustenance, shelter, clothing, moral and spiritual guidance, medical attention, education, etc. . . . ").

C.    Respondent's Defenses to Petitioner's Claims

Having found that Petitioner established the elements of his wrongful removal claim by a preponderance of the evidence, I now address Respondent's defenses. The statutory exceptions are to be construed narrowly, since "[t]he Convention establishes a strong presumption favoring return of a wrongfully removed child." *Danaipour v. McLarey*, 286 F.3d 1, 13-14 (5th Cir. 2002). Morever, these exceptions may not be used to litigate the child's best interests, nor are they established by simply showing "adjustment problems that would attend the relocation of most children." *Danajpour*, 286 F.3d at 14; *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996). Finally, "a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." *Id.*

1.    <u>Grave Risk Exception</u>

Respondent argues that S.G.S. should not be returned to France because he falls within the exception to return contained in article 13(b) of the Convention.  Under the Convention, the wrongful taking of a child from his country of habitual residence generally requires the child's return.  *See* Hague Convention, art. 12.  However, courts are "not bound to order the return of the child if the person, institution or other body which opposes its return establishes that . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  *Id.* at 13(b).  A respondent who opposes the return of the child by asserting the article 13(b) exception has the burden of proving this exception by clear and convincing evidence.  *See* 42 U.S.C. § 11603(e)(2)(A).  The "grave risk" exception is a narrow one.

Here, to satisfy her burden under the article 13(b) exception, the Respondent must establish that the alleged physical or psychological harm is "a great deal more than minimal."  *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000).  Indeed, "[n]ot any harm will do nor may the level of risk of harm be low."  *Id.*  "[T]he harm must be something greater than would normally be expected on taking a child away from one parent and passing him to another."  *Id.* (internal quotation marks omitted).  Importantly, I must not engage in a custody determination or to address such questions as who would be the better parent in the future.  *Id.*

Respondent cites the *Walsh* decision along with *Van de Sande v. Van de Sande*, 431 F.3d 567 (7th Cir. 2005) in support of her argument that S.G.S. is subject to a grave

risk of physical or psychological harm if he were to be returned to France to live with

Petitioner.  In *Walsh*, the First Circuit found that spousal abuse can be "sufficient to

make a threshold showing of grave risk of exposure to physical or psychological harm."

*Walsh*, 221 F.3d at 220.  The *Walsh* Court found

> ample evidence that . . . [petitioner] has been and can be
> extremely violent and that he cannot control his temper.
> There is a clear and long history of spousal abuse, and of
> fights with and threats against persons other than his wife.
> These include . . . [petitioner's] threat to kill his neighbor . . .
> for which he was criminally charged, and his fight with his
> son . . . .

*Id.* at 219-220.  The *Walsh* court went on to say that while the abuse was not directed

toward the minor children at issue, "his [petitioner's] temper and assaults are not in the

least lessened by the presence of his two youngest children, who have witnessed his

assaults . . . ."  *Id.* at 220.  In *Van de Sande*, 431 F.3d at 567, the Seventh Circuit held

that the mother established the "grave risk of harm" exception.  In this case, the mother

fled Belgium with her children to escape her husband's spousal abuse and threats to kill

the children.  The court stated that "given Davy's [petitioner's] propensity for violence,

and the grotesque disregard for the children's welfare that he displayed by beating his

wife severely and repeatedly in their presence . . . it would be irresponsible to think the

risk involves not only the probability of harm if the probability materializes."  *Id.* at 570.

Turning to the case at hand, while I recognize that courts have found that a grave

risk exists in some cases where severe spousal abuse is present, I find those cases

distinguishable to the facts at hand.  Here, the parties' accounts of the marital

relationship are vastly different.  Petitioner testified that there was no domestic violence

while Respondent paints a different picture. Importantly, the expert, Ms. Tavernier, could not opine as to which party was more credible. I agree with Ms. Tavernier. I find that both parties and their respective witnesses testified credibly, thus, I cannot discern which version of events to believe. The stepmother, Aurelia Salinier, a French social worker, testified that she has never witnessed any abuse by the Petitioner and would be obligated to report abuse to French authorities if it were observed. Petitioner's aunt and uncle also testified that the Petitioner is "very calm" and that they have never heard of any allegations of violence by the Petitioner. The minor child himself testified that he had no recollection of witnessing any abuse. While Respondent's mother and daughter testified to witnessing several instances of domestic violence, I do not find that such testimony constitutes clear and convincing evidence that the grave risk exception applies. Based on the evidence submitted to the Court and presented at the February 23-25, 2010 hearing, I do not find the Respondent has satisfied her burden of proving that the minor child would be subject to a grave risk of physical or psychological harm if he were returned to France.

2.    The Views of the Child

Next, I must consider whether to apply the "wishes of the child" exception. Under this exception, the court may refuse to order the return of the child "if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13. This defense must be proven by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2). The

*Pérez-Vera Report*[3] offers the following commentary with respect to the views of the

child exception:

> [The Convention] provides that the child's views concerning
> the essential question of its return or retention may be
> conclusive, provided it has, according to the competent
> authorities, attained an age and degree of maturity sufficient
> for its views to be taken into account.  In this way, the
> Convention gives children the possibility of interpreting their
> own interests.  Of course. *This provision could prove*
> *dangerous if it were applied by means of the direct*
> *questioning of young people who may admittedly have a*
> *clear grasp of the situation but who may also suffer serious*
> *psychological harm if they think they are being forced to*
> *choose between two parents.*  However, such a provision is
> absolutely necessary given the fact that the Convention
> applies, *ratione personae*, to all children under the age of
> sixteen; the fact must be acknowledged that it would be very
> difficult to accept that a child of, for example, fifteen years of
> age, should be returned against its will.

*Pérez-Vera Report* at 433, para. 30 (emphasis added).

Respondent must prove by a preponderance of the evidence through testimony

or otherwise that the minor child is of an age and maturity level for his or her views to be

taken into account.  *See England v. England*, 234 F.3d 268, 272 n. 5 (5th Cir. 2000).[4]  In

_____

[3]The Explanatory Report of Professor Elisa Pérez-Vera, referred to as the
*Pérez-Vera Report*, is recognized as the official history and commentary on the Hague
Convention.  Pub. Notice 957, 51 Fed. Reg. at 10503.

[4]  There is no defined age at which the Convention considers children sufficiently
mature enough for their views to be taken into account – it depends on the child.  See
*Blondin v. Dubois*, 238 F.3d 153, 166-67 (2nd Cir. 2001) (declining to hold as a matter
of law that 8 year old girl was too young for her views to be taken into account, and
holding that district court did not err in finding that 8 year old was mature enough to
have her views taken into account); *England v. England*, 234 F.3d 268, 272 (5th Cir.
2000) (declining to hold as a matter of law that 13 year old child is not mature enough,
but affirmed district court's decision that the 13 year old at issue was not mature enough
where she had four mothers in 12 years, had been diagnosed with ADD and had

assessing the maturity level of the minor child, the court must consider the extent to which the "child[ren]'s views have been influenced by an abductor, or if the objection is simply that the child wishes to remain with the abductor." *In Re Nicholson*, 1997 WL 446432 (D. Kan. 1997) (unreported). Application of the defense is within the court's discretion if the court believes that the child's preference is the product of undue influence over the child. *See Hazbun Escaf v. Rodriguez*, 200 F. Supp. 2d 603, 615 (E.D. Va. 2002) ("[t]he discretionary aspect of this defense is important because of the potential for undue influence by the person who allegedly wrongfully retained the child").

I find that the Respondent has failed to prove by a preponderance of the evidence that S.G.S. is of the age and maturity level for his opinions to be taken into account. Initially, I note that I find no evidence of undue influence on the part of either party as to the minor child. I base this finding on both the testimony of the minor child and the opinions of the expert, Ms. Tavernier. S.G.S. testified that he wishes to remain

---

learning disabilities, and was scared and confused by proceedings); *Silverman v. Silverman*, 2002 WL 971808 at *10 (D. Minn. 2002), (determining, after judge took 10 year old child into chambers for an ex parte discussion, that 10 year old boy was of an age and maturity level at which views could be considered in connection with the defense involving a grave risk of harm to child – the court was "particularly impressed by his behavior in learning of the upcoming legal proceedings and his desire to express his views in a letter and have them considered"), aff'd, 312 F.3d 914 (8th Cir. 2002); *Mendez Lynch v. Mendez Lynch,* 220 F. Supp. 2d 1347, 1361 (M.D. Fla. 2002) (testimony showed that 9 year old boy had attained age/maturity at which it was appropriate to take into account his objections to returning to Argentina, but court "exercised its discretion" to return child to Argentina where "[h]is memories of Argentina are those of a six year old, he has been in the virtually exclusive custody of his mother in the United States since his removal from Argentina, and his mother has articulated a desire not to return to Argentina since almost the beginning of her arrival" in the United States).

in Colorado because he wants to live with his sister.  S.G.S. actually stated that he would prefer to live in France provided that his sister could live with him.  I agree with Ms. Tavernier's opinions that S.G.S. is a well adjusted 7 year old boy, who has a good relationship with both the Petitioner and the Respondent.  I further agree with Ms. Tavernier that

> it is important to take into consideration . . . [S.G.S.'s] wishes, concerns and feelings, but with the understanding that his comprehension of the meanings of situations is not mature.  He may be consistent in his desire to stay with his mother, and he is vocal and articulate in expressing his wishes, however, his reasoning does not seem to be based on careful consideration of his interests.

Expert Report at 4.

Alternatively, Respondent asserts that the two siblings should not be separated.  However, I am not persuaded by this argument.  Respondent fails to provide any controlling legal support for her contention, and I cannot find any authority that speaks to this unique circumstance.  In *McManus v. McManus*, 354 F. Supp. 2d 62 (D. Mass. 2005), the court held that after a clinical assessment, the two younger siblings would likely suffer psychological harm if separated from the two older siblings after having "band[ed] together by conditions in the home."  Here, unlike *McManus*, the children have not lived together as siblings since early 2006 when S.G.S. was 3 years old and his half sister was 7 years old.  They have only been together for four short visits since 2006.  Finally, Ms. Tavernier did not comment on the potential harm to the minor child if separated from his half sister.

Although I find that S.G.S. was earnest in expressing his opinion that he wants to

live in Colorado with his sister, I find that his statements do not reflect a mature understanding of the situation. S.G.S. does not have a strong objection to returning to France, as he has no objection to living with his father. His stated preference is to remain in France with his sister. Based on S.G.S.'s age (7 years old), the testimony of the therapist, and my observations of S.G.S. during his testimony, I conclude that S.G.S. has not attained an age and degree of maturity at which it is appropriate to take his views into account in arriving at my decision. I do not come to this conclusion lightly. I sympathize with the minor child in this matter and can only hope that the parties will find a way to work together, outside the purview of these proceedings, so that these siblings will be able to spend time together in the future.

IV.  <u>CONCLUSION</u>

Under these circumstances, where S.G.S. has been wrongfully retained in the United States and none of the available exceptions have been established, ICARA and the Hague Convention require S.G.S.'s return to France. For the foregoing reasons, it is

ORDERED that the Petition for Return of Child to Petitioner Under the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act (docket #1), filed January 14, 2010, is **GRANTED.** It is

FURTHER ORDERED that Respondent shall return the minor child, S.G.S., to the country of France not later than **Sunday, March 7, 2010**.

In accordance therewith, it is

FURTHER ORDERED that should Petitioner wish to recover fees and costs

pursuant to 42 U.S.C. § 11607(b)(3), he may file a proper motion within **(30) thirty days**

of the date of this Order.

Dated: March 1, 2010

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge